**CHRISTINA HUMPHREY LAW, P.C.**
Christina A. Humphrey (SBN 226326)
1117 State Street
Santa Barbara, CA 93101
Telephone: (805) 618-2924
Email: christina@chumphreylaw.com

**JAMES WHITE FIRM, LLC**
James H. White IV
2100 Morris Avenue
Birmingham, AL 35203
Telephone: (205) 317-2551
Email:james@whitefirmllc.com

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley (SBN 174156)
31365 Oak Crest Dr. Suite 240
Telephone: (805) 618-2924
Westlake Village, CA 91361
Telephone: (805) 270-7100
Email: mbradley@bradleygrombacher.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT JERVAY and MERITA GETHERS, individually, as the representatives of a proposed class of similarly situated persons, and on behalf of the CHILDREN'S HOSPITAL EMPLOYEES' 401(K) AND 403(B) PLANS, <br><br> Plaintiffs, <br><br> v. <br><br> BFSG, LLC, CHILDREN'S HOSPITAL LOS ANGELES and its RETIREMENT BENEFITS COMMITTEE, DOES 1-10. <br><br> Defendants. | Case No. 2:26-cv-1905 <br><br> **CLASS ACTION COMPLAINT** |

CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

NATURE OF THE ACTION ……………………………………..……….. 1

SUMMARY OF CLAIM…………….…….…..………………………...…… 2

JURISDICTION AND VENUE……………………………..…………….…… 3

THE PLANS AND PARTIES…………………………..………………….... 4

    A.  The 401(k) and 403(b) Plans…………………………………….......... 4

    B.   Plaintiffs…………………..….………………….......................... 5

    C.  Defendants……………………….…………….................................. 5

ERISA'S FIDUCIARY DUTIES….………………………………….……… 6

FACTUAL ALLEGATIONS………………………..……………….…….. 8

    A.  The Empower/Prudential's Bundle of Products and Services ……… 8

    B.  The Need to Re-Price Service Provider Contracts ………………… 10

    C.  BFSG's Independence and Compensation……………….…….…... 13

    D.  Empower/Prudential's Recordkeeping Fees………………..…… 15

    E.  Mutual Fund Share Classes ……………………………………... 19

        1. Share Classes of Mutual Funds ………………………….….... 20

        2. Share Class Violations ………………………..……………… 21

        3. Defendants Did Not Implement a Prudent Process to Monitor
Mutual Fund Share Classes.…………………………..……… 24

    F.  Defendants Selected and Maintained Imprudent Funds that Fell
Below the Reasonable Standard of Care. …………………..…… 25

    G.  The Stable Value Options/SVOs………………….………….…... 30

        1. The Need for Professional Stable Value Advice………….…... 31

        2. Characteristics of Stable Value Products…………………..…… 32

        3. Process for Monitoring Plans' Stable Value Option….………… 36

        4. Process for Monitoring Plans' Stable Value Option….………… 38

PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' FIDUCIARY
BREACHES………………............................................................……… 43

CLASS ACTION ALLEGATIONS…………….........….…………………… 44

FIRST CAUSE OF ACTION Breach of Fiduciary Duty of Prudence (Against All Defendants)…………………………………………………... 45

SECOND CAUSE OF ACTION Breach of Fiduciary Duties in Violation of Duty to Investigate and Monitor (Against All Defendants)……..………………….… 47

THIRD CAUSE OF ACTION Prohibited Transactions (Against All Defendants)……………………………………………………………… 49

PRAYER FOR RELIEF……………………………………………...….….. 50

-iii-

## NATURE OF THE ACTION

1.      Plaintiffs Robert Jervay, Merita Gethers, individually, on behalf of the Children's Hospital Los Angeles 401(k) Plan (the "401(k) Plan") and the Children's Hospital Los Angeles 403(b) Plan (the "403(b) Plan") (collectively "Plans") and, on behalf of participants in the Plans, bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 et seq. ("ERISA"), against Defendant BFSG, LLC ("BFSG") and Defendants Children's Hospital Los Angeles ("CHLA"), the Retirement Benefits Committee for the Plans (the "Committee", and together with CHLA, the "CHLA Defendants") and DOES 1-10. Defendant BFSG and the CHLA Defendants will, from time to time, be referred to herein, collectively, as the "Defendants".

2.   Defendants breached their fiduciary duties under ERISA, 29 U.S.C. §§ 1104(a)(1) and 1105(a)(2) by failing to prudently monitor: (1) the share classes of the Plans' mutual funds; (2) the cost of the Plans' administrative expenses, including BFSG's investment advisory fees and third-party recordkeeping fees; (3) the fees and performance of the Plans' stable value options; and, (4) the fees and performance of certain underperforming mutual fund options.

3.   These fiduciary breaches resulted in substantial losses to the Plans recoverable from Defendants under ERISA, 29 U.S.C. § 1109.

4.   Defendants violated 29 U.S.C. § 406 by causing the Plans to engage in prohibited transactions pursuant to contracts with (i) the Plans' investment advisor; (ii) the Plans' stable value provider; and, (iii) the Plans' recordkeeper. The compensation paid to these service providers was not reasonable because of Defendants' failure to bid out and re-price these contracts, and Defendants thus are unable to establish an affirmative defense under 29 U.S.C. § 408(b)(2).

5.   Plaintiffs bring this action pursuant to 29 U.S.C. §§ 1132(a)(1)(B), 1132(a)(2), and 1132(a)(3) on behalf of themselves, the Plans, and a class

CLASS ACTION COMPLAINT

of participants in the Plans to recover the losses resulting from Defendants' ERISA violations and to compel Defendants to implement prudent processes to prevent further losses to the Plans.

## SUMMARY OF CLAIM

6. ERISA imposes strict fiduciary duties of prudence and loyalty on covered retirement plan fiduciaries. An ERISA fiduciary must discharge this responsibility "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. § 1104(a)(1). A plan fiduciary must act "solely in the interest of [plan] participants and beneficiaries." *Id*. A fiduciary's duties include "defraying reasonable expenses of administering the plan," 29 U.S.C. § 1104(a)(1)(A)(ii), and a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

7. Nearly two decades ago, the Defendants purchased a bundle of retirement plan services and investment products for the Plans but did not implement a prudent process for monitoring the cost of these services or the performance of the investment products. More specifically, Defendants failed to take steps to eliminate unnecessary revenue sharing fees and to re-price the Plans' investment advisory, recordkeeping, and stable value contracts in response to changing market conditions. Had Defendants prudently evaluated the Plans' products and services by comparing them to other products and services available in the marketplace, they would have discovered that the Plans' investment returns were too low and its fees too high. Defendants missed the opportunity to re-price the Plans' service provider contracts and to remove and replace underperforming investment options. Consequently, the Plans were managed for the benefit of service providers first and participants only second.

8. The Plans have during the statutory period suffered losses from the high fees service provider contracts Defendants re-price and from underperforming investments maintained on account of the fees paid to service providers. These

losses continue to accrue and to compound as a result of Defendants' failure to implement a prudent process for monitoring the fees paid to service providers and the performance of investment options, in violation by Defendants of their fiduciary duties under ERISA, 29 U.S.C. § 1104(a)(1).

## JURISDICTION AND VENUE

9.      Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a) (a)(1)(B), 1132(a)(2), and 1132(a)(3), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

10.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, because it is a civil action arising under the laws of the United States, and exclusive jurisdiction under ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

11.      This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

12.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans are administered in this District, Children's Hospital Los Angeles is located in this District, many violations of ERISA took place in this District, and Defendants conduct business in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b) because Plaintiffs were employed in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

//
//
//
//

-3-

CLASS ACTION COMPLAINT

## THE PLANS AND PARTIES

### A. The 401(k) and 403(b) Plans

13.     CHLA established the Plans in January of 2002. By January 2020, the beginning of the statutory period, nearly two decades later, the 401(k) Plan had $519 million in assets and 6,738 participants and the 403(b) Plan had $83 million in assets and 1,241 participants.

14.     Each of the Plans is a "defined contribution plan" as defined by ERISA, 29 U.S.C. § 1002(34). The purpose of the Plans is to provide retirement benefits to eligible CHLA employees through the deferral of pre-tax wages and the investment of the resulting contributions in a menu of investment options selected and ostensibly monitored by the BFSG and the CHLA Defendants.

15.     In defined contribution plans, each employee has an individual account. The benefits ultimately paid to the employee are a function of the amount the employee and employer contribute to the plan and the performance of the investments net of fees and expenses.

16.     Participants are limited to the investments selected by the Plans' fiduciaries and cannot choose alternative investments outside of the Plans' investment menus, even when the Plans' investments are inferior and superior investment alternatives are readily available in the marketplace.

17.     The 401(k) Plan is tax-qualified under 26 U.S.C. § 401(k) and commonly referred to as a "401(k) plan." As of December 31, 2024, the 401(k) Plan had $807 million in assets and 7,850 total participants.

18.     The 403(b) Plan is tax-qualified under 26 U.S.C. § 403(b) and commonly referred to as a "403(b) plan." Plans that operate under section 403(b)'s beneficial tax scheme are administered by certain qualifying non-profits, including universities and hospitals. As of December 31, 2024, the 403(b) Plan had $154 million in assets and 1,867 total participants.

//

19.    Empower Retirement, as successor to Prudential Life Insurance and Annuity Company ("Empower/Prudential") is the recordkeeper and investment platform provider for the Plans.

20.    Empower/Prudential, through a life insurance company affiliate, also is the stable value investment option provider for each of the Plans.

**B. Plaintiffs**

21.    Plaintiff Robert Jervay was invested in the Plan during the statutory period. His individual account was invested in the challenged investments, including the challenged stable value and mutual fund option, and was charged excessive administrative fees. The value of his individual account would be higher had Defendants prudently monitored the Plans' administrative expenses and investment options.

22.    Plaintiff Merita Gethers was invested in the Plan during the statutory period. Her individual account was invested in the challenged investments, including the challenged stable value fund, and was charged excessive administrative fees. The value of her individual account would be higher had Defendants prudently monitored the Plans' administrative expenses and investment options.

**C. Defendants**

23.    CHLA is designated on the Plans' Department of Labor (DOL) Form 5500 filings as the "administrator" of the Plans within the meaning of 29 U.S.C. § 1002(16)(A). In this capacity, CHLA exercises ultimate discretionary authority and control with respect to the management and administration of the Plans, including the appointment of members of the Committee, and determination of the scope of its fiduciary authority. CHLA appointed the Committee to act as a fiduciary tasked with administering and overseeing the Plans, including the selection and monitoring of service providers and investment options. Thus, Defendants CHLA and the

CLASS ACTION COMPLAINT

Committee are fiduciaries of the Plans as defined by 29 U.S.C. § 1002(21)(A)(i) and (iii).

24. Defendant BFSG served as the Plans' non-discretionary fiduciary investment advisor during the relevant period. Thus, Defendant BFSG is a fiduciary of the Plans as defined by 29 U.S.C. § 1002(21)(A)(ii).

25. The Defendants identified as fiduciaries to the Plans also are subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)–(3) because they enabled other fiduciaries to commit breaches of fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

## ERISA'S FIDUCIARY DUTIES

26. ERISA and the common law of trusts imposes strict fiduciary duties of loyalty and prudence upon Defendants as Plan fiduciaries. 29 U.S.C. §1104(a)(1)(A) requires a plan fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" for the "exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

27. 29 U.S.C. §1104(a)(1)(B) and common law requires a plan fiduciary to discharge his obligations "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims."

28. A fiduciary's duties include a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l,* 135 S. Ct. at 1829.

29. A fiduciary also has a duty to prudently select and monitor covered service providers. Courts that have considered the issue have made it clear that "the failure to exercise due care in selecting . . . a fund's service providers constitutes a breach of a trustees' fiduciary duty." 28 U.S.C. § 1108(b)(2) states services must be

-6-

CLASS ACTION COMPLAINT

necessary for the plan's operation. Department of Labor guidance has also emphasized the importance of prudently selecting service providers.[1] The DOL has observed that, when selecting a service provider, "the responsible plan fiduciary must engage in an objective process." Id. Such a process must be "designed to elicit information necessary to assess . . . the reasonableness of the fees charged in light of the services provided." Id.

30. 29 U.S.C. §1108(b)(2), as an exemption to the prohibition set forth in 29 U.S.C. §1106(a)(1)(C), allows a fiduciary of an employee benefit plan to enter into an agreement with a party in interest for the provision of administrative services such as recordkeeping to the Plan "if no more than reasonable compensation is paid therefor."

31. 29 U.S.C. §1132(a)(2) and common law authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109.

32. Section 1109(a) and common law provides "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach." "One appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust." Restatement (Second) of Trusts § 205(c) (1959).

//

//

//

//

[1] DOL Info. Letter to Theodore Konshak (Dec. 1, 1997), available at: https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/information-letters/12-01-1997 (last visited: Jan. 24. 2026).

CLASS ACTION COMPLAINT

## FACTUAL ALLEGATIONS

### A. Empower/Prudential's Bundle of Products and Services

33.  In 2020, at the beginning of the statutory period, the Plans had a bundle of products and services furnished by Prudential/Empower structured to maximize Empower/Prudential's revenue from fees and other compensation.

34.  Although the 401(k) Plan is larger than the 403(b) Plan, the bundle of products and services for each of the Plans was the same. They had the same service providers, the same investment menu, and the same fiduciaries. They were "carbon copies" of each other.

35.  The Empower/Prudential package generated revenue for Empower/Prudential in several ways.  First, the Prudential/Empower product and service bundle included a menu of mutual funds, including proprietary mutual funds that paid investment management fees to Empower/Prudential and mutual funds that paid a portion of their revenue – referred to in the industry as "revenue sharing" fees – to Empower/Prudential. To generate revenue share, many of the mutual funds were higher cost share class versions of funds for which a substantially identical fund was available in a lower cost share class version.

36.  Second, the Empower/Prudential bundle included participant recordkeeping services. Ostensibly, this was the reason that the Plans invested in revenue sharing versions of funds instead of the identical but lower cost versions of the same investments. The higher Empower/Prudential's fees were, the greater the incentive to bury high fees in revenue sharing funds.

37.  Third, the Plans paid advisory fees to BFSG that were two to three times the industry standard, which gave BFSG a financial incentive not to question other service provider fees. The re-pricing of the compensation of service providers such as Empower/Prudential would have resulted in the re-pricing of BFSG's own compensation.

38.     Fourth, Empower/Prudential requires the Plans to offer a proprietary stable value option ("SVO"), the "Guaranteed Income Fund." This SVO is furnished pursuant to group annuity contracts issued by Empower/Prudential to each of the Plans. These contracts are not mutual funds but are general account guaranteed investment contracts or "GICs." When a participant invests in the SVO, participants' retirement savings are deposited by Empower/Prudential into its general account. [2] Empower/Prudential pays a crediting rate on these deposits – the stable value equivalent of interest, which is reset every six months in advance.

39.     The GICs are specialty insurance products, with a fee structure that differs from that of mutual funds. Empower/Prudential earns "spread" on the difference between earnings on the deposits in its own general account and the amount credited to plan participants. Unlike most retirement plan investment products, which charge – and disclose – fixed rates of fees, spread-based products such as the Empower/Prudential GICs allow the provider to keep any upside gains. The crediting rate is set by Empower/Prudential in its discretion, based upon criteria for which no disclosures are provided. The lower the crediting rate is set by Empower/Prudential, the greater the spread compensation. Not surprisingly, the resulting stable value options are highly profitable for Empower/Prudential, especially in cases where plan fiduciaries neglect the re-pricing of service provider contracts.

40.     Finally, to direct the allocation of substantial plan assets to the SVOs and the mutual funds that paid investment management and revenue sharing fees, the Empower/Prudential bundles include GoalMaker, a proprietary asset allocation service. GoalMaker is a set of pre-populated investment models tied to a participant's age and risk tolerance.  One set of models serves as the "default" investment option for participants in the Plans, and additional sets are available to

---

[2] Empower/Prudential takes title to the assets of its general account, which are invested for the benefit of Empower/Prudential.

CLASS ACTION COMPLAINT

simplify the allocation process for participants who opt out of the default models. The GoalMaker allocations are structured to invest a substantial percentage of the Plans' assets in the stable value and the mutual fund options that pay investment management, spread and revenue sharing fees to Empower/Prudential. Upon information and belief, the resulting fees paid to Empower/Prudential are so substantial that Empower/Prudential provides the service to customers at no additional charge.

### B. The Need to Re-Price Service Provider Contracts

41. The fact that the Plans were bundled by and profitable for Empower/Prudential did not make the Plans' bundle of products and services imprudent *per se*. But, it did create the need for Defendants to monitor the cost of service provider contracts and the need to re-price service provider contracts at regular intervals, particularly in a retirement plan market where costs were declining as a result of greater transparency in the disclosure of fees.

42. Many of the Plans' products and services were priced as a percentage of assets. This is referred to, in the industry, as an *asset-based* fee. Asset-based fees require careful monitoring because asset-based fees increase automatically with the growth of investments over time while the cost of providing the services often does not. This creates a need to re-price the services on a periodic basis to control costs. Unless an adjustment to the pricing is made, the costs grows out of control. This is referred to as "fee creep".

43. In the market conditions that prevailed before and during the statutory period, the costs of retirement plan services were declining, in no small part due to the changes in the compensation disclosure requirements. Starting in 2012, service providers were required to disclose compensation from all sources to plan

-10-

CLASS ACTION COMPLAINT

fiduciaries.[3] This gave the fiduciaries of large plans like CHLA both the market power based on assets under management and the means based on the service provider disclosure requirements to re-price service provider fees.[4] Between 2010 and the beginning of the statutory period in 2020, total costs throughout the retirement marketplace fell by 20% for defined contribution plans with more than $100 million in assets.[5] Consultants attributed the industry changes and the attendant drop in fees to "fiduciary concerns", "transparency", "intermediary sophistication", and "unbundling asset management and recordkeeping."[6]

44.    By the beginning of the statutory period in 2020, the need for critical and independent review of the Plans' products and services would have been readily apparent to any cost-conscious fiduciary. The Plans experienced not only substantial growth in the value of their investments, but also market conditions in which service provider fees were declining. Between 2012 and 2024, the assets of the Plans truppled from contributions and investment growth, which resulted in an increase in asset-based fees. At the same time, the cost of these services, for plans that implemented prudent processes to monitor and re-price service provider contracts, was declining. This created an acute and obvious need for the Plans, which had experiences substantial growth, to bid out and re-price service provider contracts.

[3] 77 Fed. Reg. 5632 (Feb. 3, 2012); 29 C.F.R. § 2550.408b-2(c); see also *Bugielski v. AT&T Servs., Inc.*, 76 F.4th 894 (9th Cir. 2023).

[4] *E.g.*, BrightScope/ICI, *Defined Contribution Plan Profile: Close Look at 401(k) Plans, 2020*, at 49-50 (Sept. 2023) (from 2009 to 2020, total plan costs decline, with costs decreasing in proportion to the size of the plan), *available at*: https://www.ici.org/system/files/2023-09/23-rpt-dcplan-profile-401k.pdf (last visited Jan. 24, 2026).

[5] *Id.*; *see also* BrightScope/ICI, *Defined Contribution Plan Profile: A Close Look at ERISA 403(b) Plans, 2022*, at 38 (Aug. 2025), *available at:* https://www.ici.org/system/files/2025-08/25-rpt-dcplan-profile22-403b.pdf. (last visited Jan. 24, 2026).

[6] McKinsey & Company, Long-term valuation creation in US retirement, at 1-2 (Aug. 2019), *available at: at:*
https://www.mckinsey.com/~/media/mckinsey/industries/financial%20services/our%20insights/long%20term%20value%20creation%20in%20us%20retirement/long-term-value-creation-in-us-retirement.pdf (last visited Jan. 24, 2026).

CLASS ACTION COMPLAINT

However, while the Plans' peers in the industry re-priced their service provider contracts to leverage their size and information available, CHLA maintained the same entry level package of bundled services and products that Empower was marketing to small, unsophisticated plans back in 2010 prior to the major industry changes and industry-wide reductions in retirement plan fees and expenses.

45.    CHLA could not rely on Empower/Prudential act voluntarily and out of goodwill to reduce costs to reasonable levels. Empower/Prudential is a profit seeking institution that dealt with the Plans at arm's-length, not a fiduciary obligated to act in the best interest of the Plan. As a fiduciary, CHLA had to implement its own independent processes to leverage the Plans' size to obtain the best possible pricing from Empower/Prudential compared to the alternatives in the marketplace.

46.    There were standard fiduciary processes that CHLA could have implemented to satisfy its duty of independent monitoring and to re-price its service provider contracts to bring them in line with market conditions. CHLA had to collect, review, understand, and critically assess the DOL mandated service provider compensation disclosures. CHLA also had to test the market, such as by requesting product and pricing information from competing vendors of retirement products and services in a process known as a "Request for Information" or "RFI"[7] or by requesting detailed proposals from Empower/Prudential and competing vendors through a process known as a "Request for Proposals" or "RFP".[8]

47.    Had CHLA implemented these standard fiduciary processes CHLA would have been able to obtain more competitive pricing for products and services of the same or better quality. CHLA's peers in the industry did this, resulting in a

---

[7] The marketplace is highly competitive for investment products and administrative services and vendors regularly respond to RFIs to inform prospective buyers about their products and services.

[8] An RFP is more in depth than an RFI and allows the requestor to obtain customized proposals and answers to specific questions regarding the vendor's experience and the most favorable terms tailored to the requestor's needs. Vendors regularly respond to RFPs from plans with large asset bases such as the Plans given the size of the revenue opportunity.

-12-

CLASS ACTION COMPLAINT

marketplace in which the cost of service providers declined. CHLA did not, resulting in fee creep and the failure to re-price contracts in accordance with market conditions.

### C. BFSG's Independence and Compensation

48.     To implement these processes, CHLA should have been able to rely on its investment advisor BFSG, which served as financial advisor to the Committee from 2010 to 2024. Unfortunately, CHLA could not blindly rely on BFSG as its investment advisor to monitor costs because the advisers' interests were conflicted. BFSG could not advise CHLA to implement procedures to control and reduce Empower/Prudential's fees without putting its own compensation at risk.

49.     The scope of and pricing services for an investment advisor acting in this capacity are fairly standard. BFSG's scope included investment selection, monitoring, and preparation of meeting materials for the quarterly meetings of the Plans' investment committee; attendance at quarterly meetings; and services such as vendor pricing, investment policy statement review, fee benchmarking, and fiduciary training provided on an as needed basis. The reasonable cost of an investment advisor for these services over the statutory period would have ranged from $75,000 per annum to $100,000 per annum. There are pricing differences resulting from variations in the scope and quality of the services, but these are taken into account in the various services that make information available to plan sponsors to benchmark the reasonable cost of these services. Under no circumstance would the reasonable cost of such services have exceeded $120,000 per annum for this scope of work.

50.     BFSG - whose total compensation ranged from $285,033 in 2020 to $381,738 in 2023 - was grossly overcompensated for its services. As shown on the following table, BFSG's services were two to three times a reasonable amount:

-13-

CLASS ACTION COMPLAINT

| Combined 401(k) and 403(b) | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| BFSG Fees | 285,033 | 288,658 | 214,617 | 381,738 |
| Reasonable | 120,000 | 120,000 | 120,000 | 120,000 |
| Difference | (165,033) | (168,658) | (94,617) | (261,738) |

51. Similarly sized plans with investment advisors providing the same scope of services – ERISA 3(21) advisory services – paid their advisors a fraction of the amount paid to BSFG. By way of example, the similarly sized CoreLogic, Inc. defined contribution plan located in Irvine, CA paid its investment advisor an average $85,000 for the same scope of services over the same period of time. The similarly sized Live Nation Entertainment, Inc. defined contribution plan located in Beverly Hills, CA also paid its 3(21) investment advisor an average of $85,000 for the same scope of services over the same time period.

52. The cost of BFSG's services was not merely high; it fell well outside of any reasonable range.

53. In addition to being high, the cost of BFSG's services experienced "fee creep." While the value of BFSG's services remained constant, in a market that had become increasingly competitive, the amount of BFSG's asset-based fees increased dramatically over time. BFSG, as a fiduciary to the Plans, had to advise CHLA of the need to monitor and bid out its service provider contracts to control and reduce the cost of asset-based fees. However, BFSG itself was one of the primary beneficiaries of the fee creep that the Plans experienced as their assets grew over time. Were BFSG itself not one of the beneficiaries of fee creep, BFSG would have been able to provide conflict-free advice and to assist with the process of eliminating fee creep.

54. Defendants failed to take any or adequate action to monitor, evaluate or reduce BFSG's compensation, such as:

-14-

CLASS ACTION COMPLAINT

• Comparing BFSG's fees with the costs being charged for similar sized plans in the marketplace;

• Re-pricing BFSG's fees at reasonable intervals to control fee creep; and,

• Testing the market in a timely manner through a request for information or formal request for proposal.

55.    The clear explanation for the Plan overpaying for BFSG's advisory services was that the CHLA Defendants had a flawed provider selection and monitoring process that was "tainted by failure of effort, competence, or loyalty." *Braden v. Wal-Mart Stores*, 588 F.3d 585, 596 (8th Cir. 2009).

**D. Empower/Prudential's Recordkeeping Fees**

56.    Recordkeeping is a necessary service for every defined contribution plan. Recordkeeping services for qualified retirement plans, like the Plans, are essentially fixed and largely automated. It is a system where costs are driven purely by the number of inputs and the number of transactions. In essence, it is a computer-based bookkeeping system.

57.    Recordkeepers for defined contribution plans can be compensated in multiple ways, including through direct payments from the plan (participants) or employer or through indirect payments via a practice known as revenue sharing.

58.    In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the 401(k) plan's recordkeeper putatively for providing marketing, recordkeeping and administrative services for the mutual fund. These fees include: Rule 12b-1 fees, which are paid by the funds to the recordkeeper as compensation for its services and expenses in connection with the sale and distribution of fund shares; shareholder service fees; and sub-transfer agency fees. The payments are **not** tied to actual expenses incurred by the recordkeeper for services rendered.

59.    Because revenue sharing arrangements pay recordkeepers asset-based fees, prudent fiduciaries monitor the total amount of revenue sharing a recordkeeper

CLASS ACTION COMPLAINT

receives to ensure that the recordkeeper is not receiving unreasonable compensation. A prudent fiduciary ensures that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable per participant recordkeeping fee that can be obtained from the recordkeeping market through competitive bids or appropriately reduces the revenue sharing fees to avoid excessive rebates. Defendants did not do that here.

60.    Because revenue sharing payments are asset based, they bear no direct relation to the actual cost to provide services or the number of plan participants and can result in payment of unreasonable recordkeeping fees. To put it another way, recordkeepers (or any other covered service provider) receiving unchecked revenue sharing compensation accrue significant ongoing pay increases simply as a result of participants putting money aside biweekly for retirement. Additional funds come from interest, dividends and capital gains.

61.    Based on the number of plan participants and the assets in the Plan, a reasonable recordkeeping fee for the Plans would have been approximately $40 per participant (15th Annual NEPC 2020 Defined Contribution Plan & Fee Survey: https://f.hubspotusercontent00.net/hubfs/2529352/2020%20DC%20Plan%20and%20Fee%20Survey/2020%20NEPC%20DC%20Plan%20Progress%20Report.pdf. In other words, the appropriate amount for the Plans to pay for recordkeeping services may have been $40 per participant or another amount subject to proof at trial.

62.    This per participant recordkeeping fee would then have been charged to the Plans' participants in an appropriate amount based on the assets in each participant's account or through another tiered or graduated structure such that participants paid reasonable fees based on their amount invested in the Plans.  On information and belief, the fee charged to participants for recordkeeping services during the statutory period was an asset-based fee.

63.    Based on the Plans' Form 5500 filings for the Plans, the combined direct and indirect (through revenue sharing) recordkeeping fees paid by the 401(k)

-16-

CLASS ACTION COMPLAINT

and 403(b) Plans to Empower/Prudential far exceeded a reasonable amount of compensation for recordkeeping and other service provider fees.

**Children's Hospital 401(k) and 403(b) Plan Loss from Excess Recordkeeping**

| Year | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| **Plan Information:** | | | | | |
| Total Plan Participants: | 8,053 | 8,348 | 8,605 | 8,956 | 9,717 |
| Plan Assets: | $747,746,809 | $848,604,465 | $707,177,769 | $856,711,202 | $976,596,375 |
| **Actual RK Fees (at Plan Level):** | | | | | |
| Actual RK Fee ($/yr) | $858,429 | $970,930 | $558,544 | $344,872 | $798,691 |
| Expressed as Asset Based Fee (%/yr) | 0.115% | 0.114% | 0.079% | 0.040% | 0.082% |
| Equivalent Per Cap RK Fee (per participant / yr) | $107 | $116 | $65 | $39 | $82 |
| **Reasonable Fees (at Plan Level):** | | | | | |
| Reasonable RK Fee ($ / yr) | $322,120 | $333,920 | $344,200 | $358,240 | $388,680 |
| Expressed as Asset Based RK Fee (%/yr) | 0.043% | 0.039% | 0.049% | 0.042% | 0.040% |
| Equivalent Per Participant RK Fee ($/yr) | $40 | $40 | $40 | $40 | $40 |
| **Loss (at Plan Level):** | | | | | |
| Excess Fees at Plan Level ($/yr) | -$536,309.00 | -$637,010.00 | -$214,344.00 | $13,368.00 | -$410,011.00 |
| Expressed as Percentage of Assets (%/yr) | -0.072% | -0.075% | -0.030% | 0.002% | -0.042% |
| Per Cap Equivalent (per participant / yr) | -$67 | -$76 | -$25 | $1 | -$42 |

*Total Excess ($)   -$1,784,306.00*

64.    There are numerous recordkeepers in the marketplace that can provide a high level of service to the Plans, and who will readily respond to a request for proposal.

65.    The package of recordkeeping services the Plans received included standard recordkeeping services such as: government reporting services, plan sponsor support services, recordkeeping services, and plan investment services and reporting.

66.    The Plans did not receive any unique services or at a level of quality that would warrant fees greater than the competitive fees that would be offered by other providers.

-17-

CLASS ACTION COMPLAINT

67.     Recordkeeping services are largely standardized because the recordkeepers must provide these services at scale to a large number of plans and must comply with regulatory requirements.  They cannot offer bespoke sets of services to each individual plan.

68.     The bulk of the fee paid for recordkeeping services pays for core recordkeeping services that do not vary from plan to plan.

69.     For large plans like this Plan, recordkeeping services are offered in a bundle with standardized services including, but not limited to, recordkeeping, transaction processing, participant communications, plan document services to ensure compliance with new legal and regulatory requirements, plan consulting services including regarding investment selection, accounting and audit services such as Form 5500 preparation, and compliance support and testing.

70.     Some other services may be added on an ad-hoc basis including, loan processing, brokerage services, distribution services, and processing of qualified domestic relations orders but the addition of such services do not have a dramatic impact on the cost of recordkeeping services, if any, and would not explain the variable and excessive compensation received by Empower/Prudential that was not tied to the specific services rendered.

71.     This package of standard services could have been provided at lower rates by other recordkeepers.

72.     In this regard, the market for defined contribution recordkeeping services is highly competitive, particularly for defined contribution such as the CHLA Plans with thousands of participants and hundreds of millions of dollars of assets.

73.     The unreasonable fees paid to Empower/Prudential through its revenue sharing arrangements directly resulted from Defendants' choice of improper mutual fund share classes and failing to monitor Empower/Prudential.

CLASS ACTION COMPLAINT

74. The mutual funds paid annual revenue sharing fees based on a percentage of the total Plan assets invested in the fund, which were ultimately paid by Plan participants who invested in those funds. The Plan participants realized lower returns on their investments because they paid higher fund operating expenses. Over time, the lost compounded returns exceeds the amount of the revenue sharing fees.

75. Defendants failed to take any or adequate action to monitor, evaluate or reduce Empower/Prudential's, such as:

- Choosing mutual fund share classes with lower revenue sharing for the Plans;

- Compare Empower/Prudential's costs with the costs being charged for similar sized plans in the marketplace;

- Re-pricing Empower/Prudential's fees at regular intervals to control fee creep and take advantage of the declining fees in the market for retirement plan services; and

- Testing the market in a timely manner through a request for information or formal request for proposal.

76. The clear explanation for the Plan overpaying for covered service providers is that Defendants have a flawed and reckless provider selection process that is "tainted by failure of effort, competence, or loyalty." *Braden v. Wal-Mart Stores*, 588 F.3d 585, 596 (8th Cir. 2009).

**E. Mutual Fund Share Classes**

77. Defendants failed to use the Plans' bargaining power to leverage lower cost mutual fund options for the plan participants. Specifically, Defendants failed to implement a prudent process to monitor the share classes of the Plans' mutual fund options, selecting a higher cost share class of mutual funds for which a lower cost version was readily available.

-19-

### 1.  Share Classes of Mutual Funds.

78.     Mutual funds make a profit by charging investors operating expenses, which are expressed as a percentage of the total assets in the fund. Operating expenses include fund management fees, marketing and distribution fees, administrative expenses and other costs.

79.     Mutual funds often offer multiple "classes" of their shares to investors. Each class represents an identical interest in the mutual fund's portfolio. The principal difference between the classes is that the mutual fund will charge different operating expenses depending on the class.

80.     A mutual fund may charge an annual expense ratio of 1% of the gross assets of the fund to one share class, while charging another share class in that same fund an expense ratio of .50%. Thus, an investor who purchases the share class with a lower operating expense will realize a .50% greater annual return on his/her investment compared to an investor who purchases the share class with the higher operating expense. Generally, lower cost class shares are available to larger investors, such as the CHLA Plans.

81.     Wasting the trust's money (i.e., participants/beneficiaries' money) violates subsections (A), (B) and (D) of ERISA Section 404(a)(1) above.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to "minimize costs."  Uniform Prudent Investor Act (the "UPIA") §7.

82.     Individual investors, which lack bargaining power, often must invest in retail share classes of mutual fund options with higher fees. Retirement plans have access to lower cost institutional shares, mutual fund shares stripped of unnecessary fees. The CHLA Plans, with hundreds of millions of dollars invested in mutual funds, had more than sufficient bargaining power to invest in low-cost institutional shares.

CLASS ACTION COMPLAINT

83.    Plans that invest their participants' funds in higher cost share classes and subject them to higher fees engage in share class violations which are the most clear and obvious breaches of fiduciary duties in the plan. See *Tibble v. Edison*, 2017 U.S. Dist. LEXIS 130806, *40 (C.D. Cal. Aug. 16, 2017) ("Because the institutional share classes are otherwise identical to the retail share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary.").

**2.    Share Class Violations.**

84.    Before and during the statutory period, Defendants caused the Plans to offer higher cost mutual fund share classes as investment options even though lower cost class shares of those exact same mutual funds were readily available. Plaintiffs have identified six funds that offered at least one other less expensive share class during the limitations period. Apart from the expenses and their adverse effect on yield and performance, share classes are identical. They share the same portfolio manager(s), stocks/bonds, allocations and risk characteristics. While it is possible that some share classes have higher minimum initial investment requirements, those requirements are commonly waived for qualified retirement plans, and all funds have sufficient assets to meet the highest minimum. Four of the six funds with less expensive share classes are discussed below. The Defendants' actions to choose high-cost funds demonstrate a lack of prudence.

85.    The chart below shows the total return lag for the high-fee share classes that Defendants maintained in the Plan during the relevant period.

-21-

CLASS ACTION COMPLAINT

**Cost of Expensive Shares in the 401(k) and 403(b) Plans through Limitations Period**
**Cumulative (Total) Returns**
**(Ending 12/31/25)**

| Name | Expense Ratio % | 1-Year % Total | 6-Year Total* | 6-Year % / 6* | 2020 BOY Assets^ | Returns Lost for Using Expensive Share Class |
|---|---|---|---|---|---|---|
| American Funds Growth Fund of Amer A (2009 - present) | 0.59 | 19.93 | 140.77 | | $51,275,151 | |
| American Funds Growth Fund of Amer R6 | 0.29 | 20.28 | 145.39 | | | |
| *Cost of Expensive Share Classes* | *-0.30* | *-0.35* | *-4.62* | *-0.77* | | *-$2,367,667.02* |
| PGIM Jennison Growth Z (2013 - present) | 0.69 | 14.82 | 159.07 | | $52,318,828 | |
| PGIM Jennison Growth R6 | 0.57 | 14.95 | 160.87 | | | |
| *Cost of Expensive Share Classes* | *-0.12* | *-0.13* | *-1.80* | *-0.30* | | *-$939,474.55* |
| T. Rowe Price Equity Income (2011 - present) | 0.67 | 14.58 | 73.12 | | $47,315,764 | |
| T. Rowe Price Equity Income I | 0.56 | 14.72 | 74.28 | | | |
| *Cost of Expensive Share Classes* | *-0.11* | *-0.14* | *-1.16* | *-0.19* | | *-$550,789.09* |
| Victory Sycamore Established Value I (2021 - present) | 0.58 | 2.65 | 60.44 | | $29,994,852 | |
| Victory Sycamore Established Value R6 | 0.54 | 2.68 | 60.72 | | | |
| *Cost of Expensive Share Classes* | *-0.04* | *-0.02* | *-0.28* | *-0.06* | | *-$83,163.13* |
| Dodge & Cox Income I (2009 - present) | 0.41 | 8.32 | 19.29 | | $19,902,690 | |
| Dodge & Cox Income X (inception date in 2022) | 0.33 | 8.45 | 19.60 | | | |
| *Cost of Expensive Share Classes* | *-0.08* | *-0.13* | *-0.31* | *-0.10* | | *-$61,211.12* |
| TCW MetWest Total Return Bd Admin (2009 - 2024) | 0.78 | 0.71 | -3.14 | | $22,803,633 | |
| TCW MetWest Total Return Bd Plan | 0.37 | 1.12 | -1.21 | | | |
| *Cost of Expensive Share Classes* | *-0.41* | *-0.41* | *-1.93* | *-0.39* | | *-$440,555.47* |
| | | | | | | **($4,442,860)** |

\* The 6-Year %/6 figures (based on the limitations period beginning in 2020) illustrate that the cost to participants in lost returns is typically greater than the charged annual expenses. If a fund has not been in the plan for the full six years, the calculations, performance, and beginning assets are adjusted accordingly.
^ Assets from the 401(k) and 403(b) plans are combined

86.    During or prior to 2009, Defendants chose the American Funds Growth Fund of America Class A as an investment option available to participants, while the less expensive R6 share class was available. The information provided in the American Funds Growth Fund of America annual prospectuses clearly shows a significant difference in fees and investment returns between the Class A and R6 share classes.

87.    At the beginning of the limitations period, American Funds Growth Fund of America had the R6 share class available with no 12b-1 fees and lower

-22-

CLASS ACTION COMPLAINT

twenty-five basis points (0.25%/yr) in 12b-1 fees and nine basis points (0.09%) more in "other" expenses. Class A share fees were reduced somewhat by 2025 to 0.24% in 12b-1 fees and 0.10% in "other" expenses. In either case, the total fees paid for the Class A share were more than twice those paid by participants in the R6 share class (0.59% vs 0.29% in 2025).

88.    During or prior to 2009, Defendants chose the PGIM Jennison Growth A as an investment option available to participants; it was replaced by the Z share class in 2013, while the less expensive R6 share class was available. The information provided in the PGIM Jennison Growth annual prospectuses clearly shows a significant difference in fees and investment returns between the Class Z and R6 share classes.

89.    PGIM Jennison Growth offered the R6 share class with lower "other" expenses as compared to the Class Z shares. Class Z paid thirteen basis points (0.13%/yr) in "other" expenses compared with the R6 shares' two basis points (0.02%) as of 2020; both fees remained unchanged in 2025. The total fees paid by participants for the Class Z share were eleven basis points (0.11%) more than those they could have paid through the R6 share class (0.69% vs 0.58% in 2025).

90.    In 2011, Defendants chose T. Rowe Price Equity Income (Investor Class) as an investment option for the participants, while the less expensive I Class was available. The information provided in the T. Rowe Price Equity Income annual prospectuses clearly shows a significant difference in fees and investment returns between the Investor Class and I Class.

91.    T. Rowe Price Equity Income offered the I Class with lower "other" expenses as compared to the Investor Class. The Investor Class paid eleven basis points (0.11%/yr) in "other" expenses compared with the I Class's one basis point (0.01%) as of 2020. In 2025, "other" expenses for the Investor Class rose to fourteen basis points (0.14%), while the I Class "other" expense rose to three basis points (0.03%). The total fees paid by participants for the Investor Class were eleven basis

CLASS ACTION COMPLAINT

points (0.11%) more than those they could have paid through the I Class (0.67% vs 0.56% in 2025).

92.     In 2014, Defendants chose TCW Metropolitan West (MetWest) Total Return Bond Administrative (Admin) Shares as an investment option available to participants, while the less expensive Plan Class was available. The information provided in the TCW MetWest Total Return Bond annual prospectuses clearly shows a significant difference in fees and investment returns between the Admin Class and Plan Class.

93.     At the beginning of the limitations period, TCW MetWest Total Return Bond had the Plan Class available with no 12b-1 fees and lower "other" expenses as compared to the Admin Class chosen by the Defendants, which paid twenty-one basis points (0.21%/yr) in 12b-1 fees and twenty basis points (0.20%) more in "other" expenses than the Plan Class. Throughout the limitations period until its removal in 2024, the total fees paid for the Admin Class were more than twice those paid by participants in the Plan Class (0.78% vs 0.37% in 2024).

94.     For each of these funds, there is no difference between the share classes other than costs and performance returns as a consequence of costs, all borne by the participants.

### 3. Defendants Did Not Implement a Prudent Process to Monitor Mutual Fund Share Classes.

95.     These share class violations occurred because Defendants did not implement a prudent process for monitoring the share classes of the Plans' mutual fund investment options.

96.     A prudent fiduciary conducting an impartial review of the Plans' investments would have identified the cheaper share classes available and transferred the Plans' investments in the above-referenced funds into the lower share classes at the earliest opportunity.   The total amount of excess mutual fund expenses paid by plan participants over the past six years, which correspondingly

-24-

CLASS ACTION COMPLAINT

reduced the return on the plan participants' investments, resulted in a substantial loss to participants even after credits for payments to service providers are taken into account.

97.    The use of revenue sharing resulting from the selection of higher cost share classes to pay plan expenses does not justify the increased fees and lost returns imposed on participants. Funding expenses through revenue sharing is inherently inefficient because it deprives participants of the time value of money. Revenue sharing reduced yields immediately, while payment for services does not occur until later. The time value of the money is wasted. This effect is particularly pronounced in cases where service providers withhold more revenue sharing than necessary to cover costs, which results in the accumulation of a much larger pool of money that is not working for the benefit of participants. The presence of such a pool of money also tends to result in service providers charging higher fees than necessary. As a result, for each dollar lost as a result of a share class violation, the Plans received less than a dollar's worth of credit against plan expenses.

**F. Defendants Selected and Maintained Imprudent Funds that Fell Below the Reasonable Standard of Care.**

98.    Plan fiduciaries have a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).  When considering fund performance, Plan fiduciaries must consider relevant performance benchmarks.

99.    Mutual fund portfolio managers choose a benchmark index to use in their prospectus as a comparison for evaluating fund performance often referred to as the primary prospectus benchmark.

100.    However, the investment objective listed in the fund's prospectus does not always adequately explain how the fund is invested.[9]   In these cases, the broad-

_____

[9] Morningstar, Inc. ("Morningstar") is a respected financial services company that provides research and analytics that are used throughout the asset management industry.  "Morningstar found that the investment objective listed in a fund's prospectus often did not adequately explain how the fund actually invested" and Morningstar "solved this problem by breaking portfolios into peer groups based on their holdings" which "help investors identify the top performing funds,

based market comparators selected by the fund manager as their primary benchmark and that of the funds may reflect a "low degree of correlation" with the corresponding benchmark.[10]  A prudent fiduciary must evaluate the performance of the mutual fund using the most accurate benchmark.[11]  In this case, the investment menu for the Plans included a fund, the American Funds Growth Fund of America, whose performance departed from its primary manager designated benchmark. The fund manager designated the S&P 500 Index as the primary benchmark. The leading mutual fund research provider, Morningstar, has determined that the Russell 1000 Growth Index is a more appropriate index to represent funds in the Large-Cap Growth asset class. A prudent fiduciary would have benchmarked the performance of the fund against this or similarly situated Large-Cap Growth index.

101.   Moreover, while the American Funds Growth Fund of America A (AGTHX) performed well for a period of many years, it was a victim of its own success. The performance of the fund prior to 2009 attracted large inflows of capital. The resulting increase in the size of the fund from these inflows made it significantly more difficult to manage. By December 31, 2019, the last full quarter before the beginning of the class period, the underperformance of the funds was severe enough

---

assess potential risk, and build well-diversified portfolios."
http://morningstardirect.morningstar.com/clientcomm/morningstar_categories_us_april_2016.pdf

[10] https://www.morningstar.com/articles/372237/understanding-best-fit-versus-standard-indexes

[11] Per Morningstar, [t]he driving principles behind the classification system are as follows: Individual portfolios within a category invest in similar types of securities and therefore share the same risk factors (for example, style risk, prepayment risk): (i) Individual portfolios within a category can, in general, be expected to behave more similarly to one another than to portfolios outside the category; (ii) The aggregate performance of different categories differs materially over time; (iii) Categories have enough constituents to form the basis for reasonable peer group comparisons; (iv) The distinctions between categories are meaningful to investors and assist in their pursuit of investing goals. *Id.*

CLASS ACTION COMPLAINT

that a prudent fiduciary would have removed the fund from the Plans' investment menu.

102.    This is not mere hindsight bias: a prudent fiduciary evaluates actively managed funds on an annual basis, at a minimum, to determine whether the costs of active management are justified by a manager's ability to identify inefficiency within its asset class, thus making it more likely that the investment will outperform its benchmark index. See Restatement (Third) § 90 cmt h(2). Absent such a likelihood, a prudent fiduciary will use a passive investment. See id.

103.    To assess the performance of a fund, prudent fiduciaries typically analyze the previous 1-year, 3-year, 5-year, and 10-year periods of time. As of the end of 2019, the last full quarter before the beginning of the statutory period, the American Funds Growth of America Fund underperformed the Russell 1000 Growth Index over a 1-year, 3-year, 5-year, and 10-year period of time.

104.    As of December 31, 2019, there would have been any number of alternative investments with better performance, including low-cost index funds[12] that seek to emulate the performance of the Russell 1000 Growth Index and actively managed funds[13] that are in the Large Cap Growth category and have demonstrated the ability to routinely outperform the same, or similar index.

105.    The following chart compares the performance of American Funds Growth Fund of America to these performance benchmarks:

---

[12] An index fund is a passively managed, pooled investment product designed to mirror the performance of a particular benchmark index. Russell 1000 Growth index funds, for example, aim to track the Russell 1000 Growth Index, a market capitalization-weighted index of 1000 of the largest publicly traded companies in the United States.

[13] Actively managed funds seek to outperform certain broad market segments identified by the fund's investment manager. Any number of such funds are available from leading investment managers, whose funds are sold on the basis of merit.

-27-

CLASS ACTION COMPLAINT

| Ticker | Fund Name | BoY 2020 Assets | 6-Year Difference (%) | 6-Year Difference ($) | Expense Ratio |
|---|---|---|---|---|---|
| | **Cumulative Performance vs Passive and Active Comparators Ending 12/31/2025** | | | | |
| AGTHX | American Funds Growth Fund of Amer A | $44,380,242 | 140.77 | | 0.59% |
| | **vs. Broad Market Index** | | | | |
| | Russell 1000 Growth TR USD | | 182.49 | | - |
| | Difference | | -41.71 | ($18,511,969) | |
| | **vs. Passively Managed Comparator Products** | | | | |
| TILIX | Nuveen Large Cap Gr Idx R6 | | 181.65 | | 0.05% |
| | Difference | | -40.88 | ($18,142,752) | |
| VIGAX | Vanguard Growth Index Admiral | | 177.36 | | 0.05% |
| | Difference | | -36.59 | ($16,237,542) | |
| | **vs. Active Fund Comparator Products** | | | | |
| FBGKX | Fidelity Blue Chip Growth K | | 220.93 | | 0.54% |
| | | | -80.15 | ($35,572,816) | |
| FCNKX | Fidelity Contrafund K | | 174.02 | | 0.56% |
| | | | -33.25 | ($14,755,747) | |
| FGCKX | Fidelity Growth Company K | | 243.20 | | 0.62% |
| | | | -102.43 | ($45,456,953) | |
| FOCKX | Fidelity OTC K | | 193.86 | | 0.65% |
| | | | -53.08 | ($23,558,489) | |
| JGVVX | JPMorgan Growth Advantage R6 | | 183.41 | | 0.50% |
| | | | -42.64 | ($18,922,110) | |
| JLGMX | JPMorgan Large Cap Growth R6 | | 187.85 | | 0.44% |
| | | | -47.08 | ($20,892,043) | |
| | **Average Difference** | | | ($23,561,158) | |
| | **Median Difference** | | | ($18,922,110) | |

Notes:

1. Nuveen Large Cap Growth Index tracked the Russell 1000 Growth TR USD Indx

2. Vanguard Growth Index tracked the CRSP US Large Cap Growth Index

106.   Performance differentials of this magnitude would have attracted the attention of a prudent fiduciary. AGTHX consistently underperformed against the Russell 1000 Growth Index over 1, 3, 5, and 10-year periods. The additional fees associated with the retention of this actively managed fund AGTHX were not justified by any excess returns in this instance. This fact is confirmed by a comparison to Vanguard Growth Indx (VIGAX), which seeks to emulate the

-28-

performance of a similar large-cap growth benchmark, and offered by Vanguard, the oldest, largest and most reputable supplier of index funds. At minimum, the sponsor could have chosen the passive comparator and participants would have fared better. Furthermore, any investigation would have revealed that there were any number of active funds that were able to outperform the Russell 1000 Growth Index in the same Large Cap Growth Category over the same time period.

107.    Despite persistent evidence that the American Funds Growth of America was performing poorly, and unlikely to outperform even half of its peers, much less large-cap growth benchmarks, the Defendant failed to remove the funds in favor of marketplace alternatives with lower costs and better track records.

108.    The failure to remove the fund has caused significant losses for the Plans' participants. As shown by the following chart, American Funds Growth of America, which underperformed on a 1-year, 3-year, 5-year, and 10-year basis at the beginning of the statutory period, continued to underperform during the statutory period.

//

//

//

//

//

//

//

CLASS ACTION COMPLAINT

**Cumulative Performance vs Active Comparators as of 12/31/2019**

| Fund Name | Ticker | 1-Year | 3-Year | 5-Year | 10-Year | Expense Ratio |
|---|---|---|---|---|---|---|
| **American Funds Growth Fund of America A** | **AGTHX** | **28.12** | **56.95** | **79.35** | **237.61** | **0.59%** |
| *vs. Broad Market Index* | | | | | | |
| *Russell 1000 Growth TR USD* | | *36.39* | *74.90* | *97.90* | *312.33* | - |
| **Difference** | | **(8.27)** | **(17.95)** | **(18.55)** | **(74.72)** | - |
| **vs. Passive Funds Invested in Index** | | | | | | |
| Nuveen Large Cap Growth Index[1] | TILIX | 36.27 | 74.50 | 97.28 | 309.31 | 0.05% |
| **Difference** | | **(8.15)** | **(17.55)** | **(17.93)** | **(71.69)** | |
| Vanguard Growth Index Admiral[2] | VIGAX | 37.23 | 69.52 | 85.84 | 290.32 | 0.05% |
| **Difference** | | **(9.11)** | **(12.57)** | **(6.49)** | **(52.71)** | |
| **vs. Active Fund Comparator Products** | | | | | | |
| Fidelity Blue Chip Growth K | FBGKX | 33.56 | 84.04 | 99.16 | 340.63 | 0.54% |
| **Difference** | | **(5.44)** | **(27.09)** | **(19.81)** | **(103.01)** | |
| Fidelity Contrafund K | FCNKX | 30.17 | 68.70 | 86.01 | 273.34 | 0.56% |
| **Difference** | | **(2.05)** | **(11.75)** | **(6.66)** | **(35.72)** | |
| Fidelity Growth Company K | FGCKX | 38.52 | 81.19 | 107.54 | 373.24 | 0.62% |
| **Difference** | | **(10.40)** | **(24.24)** | **(28.19)** | **(135.63)** | |
| Fidelity OTC K | FOCKX | 39.38 | 87.40 | 114.84 | 391.50 | 0.65% |
| **Difference** | | **(11.26)** | **(30.45)** | **(35.49)** | **(153.88)** | |
| JPMorgan Growth Advantage R6 | JGVVX | 36.49 | 83.33 | 103.21 | 344.86 | 0.50% |
| **Difference** | | **(8.37)** | **(26.38)** | **(23.86)** | **(107.24)** | |
| JPMorgan Large Cap Growth R6 | JLGMX | 39.39 | 93.96 | 105.72 | 332.61 | 0.44% |
| **Difference** | | **(11.27)** | **(37.01)** | **(26.37)** | **(95.00)** | |

Notes:
1. Nuveen Large Cap Growth Index tracked the Russell 1000 Growth TR USD Indx
2. Vanguard Growth Index tracked the CRSP US Large Cap Growth Index

## G. The Stable Value Options/SVOs

109.   The SVO or the Plans provided returns that were substantially lower than the returns of comparable stable value products in the marketplace. The CHLA Plans had the means to implement a prudent process to monitor the SVOs, upon discovering that the SVO's returns were below-market, the opportunity to replace the SVOs with a different stable value option that paid out a higher crediting rate to participants for the same or less risk.

//

-30-

CLASS ACTION COMPLAINT

### 1.    *The Need for Professional Stable Value Advice*

110.    To implement a prudent process for monitoring the Plans' SVO, a plan with a substantial investment in stable value must monitor the products available in the stable value marketplace on an ongoing basis and solicit bids from existing and competing stable value providers at periodic intervals. This generally requires the aid of a professional advisor or stable value consultant, because the members of a typical plan fiduciary committee – and even some investment advisors – do not have sufficient in-house expertise or resources to monitor the stable value market or to solicit competing bids.

111.    In discharging their fiduciary duties, plan fiduciaries may not rely upon advice from third-party service providers such as Prudential/Empower which has a strong financial incentive in the plans' continued use of the existing stable value option.  Prudential/Empower is not a fiduciary to the Plan and is free to give advice and make recommendations that advance its own interests at the expense of the Plans and participants.

112.    It is common for stable value providers such as Empower/Prudential to offer plans a stable value product on a take-it-or-leave it because the plan sponsor is unaware that it can  take advantage of the better stable value options that may not be bundled with recordkeeping and would otherwise be readily available.

113.    In addition, Plans the size of the CHLA 401(k) and 403(b) Plans have ready access to professional financial advice, BFSG in this case. The cost of conducting a RFP, or at the very least a RFI, typically is included in the advisor's annual fee. In these instances, the plan can conduct a RFI/RFP at no additional cost to participants. The cost is more than justified by the potential gains even when not included in the advisor's standard fee.

114.    Moreover, as the amount of stable value assets increases, the size of the opportunity for gain also increases. Stable value product providers generate revenue as a percentage of the assets invested. Product providers achieve substantial

CLASS ACTION COMPLAINT

economies of scale by capturing $10 to 25 million or more from a single customer and are generally willing to pass some of those benefits back to customers in the form of higher crediting rates to win the business. An eight-figure stable value investment on the scale of the Plans' investment in the SVO not only makes product due diligence cost effective; the Plans' bargaining position to obtain a higher crediting rate is stronger as well.

115.    In this case, the 401(k) and 403(b) Plans had the economies of scale, bargaining power, and access to professional advice sufficient to access the stable value product on competitive terms. Although the 403(b) Plan's stable value option was smaller than the 401(k) Plan's stable value option, a prudent plan sponsor would leverage the Plans' combined assets to access the stable value market. Moreover, the CHLA Plans were already paying BSFG $200,000 to $400,000 per year to provide investment advice and had every reason to expect and insist on the highest level of service. BFSG, receiving compensation in these amounts, has no excuse for failing to test the market for alternative stable value products at regular intervals.

### 2. *Characteristics of Stable Value Products.*

116.    The requirements for monitoring a stable value contract arise out of the characteristics of stable value products. Mutual funds comprise substantially all non-stable value investments in defined contribution plans, but stable value products such as the Empower/Prudential SVO involve an entirely different investment vehicle and asset class.[14]  For fiduciaries accustomed to mutual funds, stable value products are not intuitive and require their own monitoring framework.

117.    Unlike stable value funds, mutual funds are regulated under federal securities laws and must make robust public disclosures of fees, assets, performance, market benchmarks, and fund operations. Mutual funds are also structured intuitively and, in most cases, transparently to pass asset returns directly to

---

[14] Stable value products are a subset of the capital preservation asset class, which includes stable value products and money market funds.

investors, net of disclosed fees. A fiduciary can readily compare a mutual fund's fees and performance against the fund's self-selected market benchmark to monitor whether it is performing in line with expectations. A fiduciary can likewise compare a mutual fund's performance and fees to similar mutual funds with the same investment objective. Low-cost subscription databases are readily available to fiduciaries that compile the entire universe of mutual fund performance, fee, and portfolio data and provide support tools designed to allow investors to quickly and effectively research and monitor mutual funds. Finally, the terminology applicable to mutual funds – because of the regulatory structure – is uniform.

118.   Stable value contracts, particularly general account stable value products, are very different. A stable value product is similar to a money market fund in that it provides principal protection and liquidity, but provides higher returns similar to bond funds. But, the similarities to money market funds, and even to bond funds end there. Whereas the returns of bond funds are not guaranteed and the fund can lose money, the returns of general account stable value contracts such as the Plans' stable value option are guaranteed by an insurance company. Principal protection for stable value products is provided by a guarantee – called a "wrapper" – that the stable value product will transact at "book value." In other words, a participant that deposits a dollar in the stable value product may withdraw the dollar plus interest credited to the participants' account (this interest is the "crediting rate"). The book value guarantee stabilizes returns. The value of the participants' interest does not rise and fall with changes in interest rates, as in the case of a bond fund.

119.   Stable value products also are similar to money market funds, which, like stable value funds, are capital preservation options. Like money market funds, stable value products provide liquidity, seek to preserve principal, and provide a positive rate of return. But, unlike money market funds, which provide returns equivalent to an ultra-short term bond fund with a portfolio duration of 60 days,

CLASS ACTION COMPLAINT

general account GICs, which typically are supported by a fixed income portfolio with an average duration in the 6-year range, provide returns equivalent to an intermediate term bond fund.

120. In addition to the declared crediting rate, the stable value contract may also guarantee a minimum rate. The crediting rate of a stable value fund often is reset at periodic intervals, by formula or in the case of products such as the Plans' stable value option, at the discretion of the issuer. The guaranteed minimum establishes a floor below which the crediting rate may not be reset.

121. There are two main types of stable value products found in both 401(k) and 403(b) plans: general account products and separate account products.[15] In the case of separate account products, deposits are placed in an insurance company separate account, where they are insulated from the claims of the insurance company's general creditors. In the case of general account stable value contracts, such as the Prudential/Empower GICs, the deposits are held unrestricted in the general account of the insurance carrier, where they are subject to the claims of the insurance company's general creditors.

122. The crediting rates of general account stable value products are not typically bound to the performance of underlying assets in the provider's general account. Instead, the crediting rates are set by the product provider in its discretion. Many product providers, including Prudential/Empower, do not disclose how much investment revenue they earn on underlying assets compared to the crediting rate (called the "spread").

123. A stable value product is less sensitive to changes in interest rates than conventional bond funds. Crediting rates rise more slowly than bond returns when

---

[15] There are also "synthetic" stable value products – structured as collective investment trusts (CIT) with bond portfolios supported by multiple insurance wrappers – that dominate the stable value market for large 401(k) plans. As a matter of historical accident in the drafting of the tax code, CITs are not qualified investments for 403(b) plans. Thus, for hospitals with a 403(b) and 401(k) that want to use the same stable value product for both plans may use a separate or general account stable value product, but not a synthetic account stable value product.

CLASS ACTION COMPLAINT

interest rates rise and fall more slowly when interest rates drop. Stable value contracts are just that: stable, for better and for worse. A stable value product that performs well generally continues to perform well, in a stable manner. A stable value product that performs poorly, such as the fund selected by the CHLA and the BSFG Defendants, generally continues to perform poorly, also in a stable manner. Consequently, a fiduciary to a plan that fails to monitor an underperforming stable value fund has taken on a long-term problem.

124.   There are risks associated with stable value products that bond funds do not have. One is issuer risk. Whereas bond funds are diversified against the risk of payment default, stable value products are subject to the risk that the issuer of the GIC or wrap contract will default. Another risk is liquidity, restrictions on the ability of the plan or participants to remove or replace the stable value contract with another investment. Whereas a plan may replace a mutual fund on 60 days' notice or less, stable value contracts often impose restrictions on the replacement of the product. At the plan level, such restrictions may include a fixed surrender charge, a possible payout reduction based on market conditions, or a payout delay of up to a year or more. At the participant level, such restrictions may include limits on transfers to competing investment options, referred to in the industry as an "equity wash".

125.   Finally, unlike mutual funds, there is no uniformly agreed up set of terminology used to describe stable value products. For example, Empower/Prudential uses the trade name "Guaranteed Income Fund" or "GIF" to describe the SVO. The Form 5500 filings may refer to the same product as a "fixed income' option, a "guaranteed income contract" or "GIC", or a group annuity contract.

126.   All of these features make stable value products and, particularly, general account products like the Plans' SVOs, less transparent than mutual funds. For these products, there is no objective or reliable securities benchmark that can be designated by the stable value product provider to measure the product's

CLASS ACTION COMPLAINT

performance over time. Unlike a mutual fund, the GIC issuer is not required to designate a benchmark. Thus, although there are indices that track stable value market conditions (e.g. the Hueler Index), these are most appropriate for benchmarking fee-based separate and synthetic stable value products, not general account GICs. Nor are there standardized mutual fund type fees (e.g. investment management fees, 12b-1 fees, and sub-TA fees). In the case of a general account GIC, the provider's compensation (the "spread") and the process used to determine the crediting rate are typically not disclosed. There are no subscription databases that have reliable and up to date information regarding current general account stable value product terms and historical performance. This lack of transparency is the reason that a plan sponsor such as CHLA must have access to a professional advisor with knowledge of the stable value market and must issue request for information and solicit competing bids from competing stable value providers at regular intervals. In the vast majority of cases, testing the market in this fashion with the assistance of a professional advisor or stable value consultant is the only prudent and effective way to monitor a product such as the Plans' Empower/Prudential GICs.

### 3. Process for Monitoring Plans' Stable Value Option.

127.   The information that a plan fiduciary with a substantial investment in a general account stable product must monitor includes:

- the committees' stable value expertise and need for a professional stable value consultant or advisor;

- a review of the stable value contract, schedules, addendums and product literature, including rate setting provisions, minimum crediting rates, plan and participant level liquidity provisions (including equity wash and exit provisions), and issuer domicile and credit rating;

- the current and historical crediting rates (from rate change notices);

-36-

CLASS ACTION COMPLAINT

- the earnings history of the product over standard time intervals, including annual earnings and the 1, 3, 5 and 10-year averages;

- the credit rating of the issuer;

- any fees charged to the stable value option, including revenue sharing fees;

- the returns of potential benchmarks and, even more importantly, the limitations on the use of benchmarks in measuring the performance of general account stable value products;

- the rates offered by competing products to similar plans, including current, minimum, and long-term average rates;

- the rates offered by the leading providers in industry; and,

- market information derived from negotiations with the stable value provider, periodic requests for quotes, requests for information, and requests for proposal.

128. A fiduciary must assess its committee members' stable value expertise, or lack thereof, and engage a competent and knowledgeable advisor to fill any gaps. Stable value is its own asset class (or sub-class), and stable value consulting is a specific area of expertise among investment advisors.

129. From time to time, the committee must ask the stable value consultant or advisor to conduct a review of the stable value contract provisions that affect the risk and return of the product and make this information available to the decision-makers.

130. The Committee's standard quarterly investment monitoring should include a review of publicly available information regarding competitor products. While competitive information is more limited for general account stable value products than it is for mutual funds, the leading provider of general account products to 403(b) plans, TIAA, publishes current rates, annualized rates by year, and 5- and 10-year averages. Indices such as the Hueler Index, which tracks the performance of

-37-

separate and synthetic GICs, should be consulted to determine general market conditions. Information from trade groups, such as the Stable Value Investment Association (SVIA) also is available.

131.    A fiduciary must also regularly engage in the more formal RFI and RFP process. For general account stable value products, it is important for fiduciaries to conduct a RFP or RFI at least every few years to monitor the marketplace. The marketplace for general account products in 401(k) and 403(b) plans is competitive and product providers regularly respond to RFIs or RPPs.

132.    A RFP is preferred because it goes beyond the product overview solicited via an RFI and allows the plan fiduciary to ask specific questions and request specific documents to further vet available products. A RFP process typically includes a meeting or series of meetings with prospective providers to allow the providers to develop their best offers and to allow the plan fiduciary and its advisor to ensure that they understand each option. The RFP process provides an important opportunity for the plan fiduciary to negotiate with prospective providers and select the product that best serves the need of participants.

### 4. Plans' Failure to Follow a Prudent Process.

133.    In this case, the 401(k) Plan's investment in the Empower/Prudential SVO ranged from $68 million in 2020 to $58 million at the end of 2024. The 403(b) Plan's investment ranged from $14 million in 2020 to $15 million at the end of 2024.

134.    With these amounts invested in the SVOs, the Plans had more than sufficient bargaining power and resources to monitor the SVOs and to access a competitively priced stable value product alternative. But despite having the resources to access competitive stable value products, the Plans failed to identify that the Empower/Prudential GICs were an inferior product, much less to secure a replacement product with competitive crediting rates.

-38-

CLASS ACTION COMPLAINT

135.   Had Defendants prudently monitored the marketplace for stable value options, the deficiencies in the Plans' SVOs would have been readily apparent.

136.   For the 10-year period ending in 2025, the Plans' stable value funds have returned an average of about 1.9% compared to an industry average of 2.61% for other general account products.[16]  The .70% difference was material. The U.S. Federal Reserve's target rate of inflation was 2%. Whereas the average stable value fund achieved a modest return compared to the target inflation rate, the Plans' SVOs would have lost money slowly in real dollar terms.

137.   General account stable value products such as the SVOs are more common in the healthcare industry than in other markets. Hospitals such as CHLA often have not for profit entities that sponsor 403(b) plans. 403(b) plans, as a matter of historical accident cannot use collective investment trusts. As a result, although general and separate account stable value products are available to them, synthetic stable value products, which are typically structured as CITs, are not. In the healthcare market, the market leader for stable value products is TIAA-CREF. As a matter of basic competence, a fiduciary to a hospital plan must be familiar with the crediting rates offered by TIAA.

138.   The crediting rates offered by the Plans' SVO trailed the crediting rates offered by TIAA for comparable products by a wide margin. Over the five-year period from 2015 to 2019, the average annual crediting rate was 1.94% for the 401(k) SVO and 2.03% for the 403(b) SVO. The comparable version of TIAA's general account stable value product, the TIAA RC Plus, paid its investor plans an average of 3.25% per year over the same period.[17]

---

[16] *See* Stable Value Investment Association (SVIA), "Stable Value at a Glance" last updated Sep. 30, 2025 at: https://www.stablevalue.org/stable-value-at-a-glance/ last visited Jan. 20, 2026.

[17] TIAA publishes information regarding the performance of the TIAA RC Plus general account stable value product for a sample contract on its website, available at: https://fluenttech.tiaa.org/pdf/factsheet/878094101-TIAAPRCP.pdf (last visited Jan. 26, 2026). The TIAA product is a meaningful benchmark for the Plans' SVO. Both are general account GIC

CLASS ACTION COMPLAINT

139.   This alarming earnings deficit relative to the leading provider and industry peers should have put Defendants on notice that it needed to put the Plans' stable value options out for bid.

140.   The CHLA Plan had the means to test the market for the general account GICs and to replace the SVO with a better product. Had the CHLA Plans done this, the Plans would have been able to secure a general account GIC contract, on substantially the same terms as the Empower SVO, at market crediting rates. For at least part of the statutory period, from 2020 to mid-2022, the Plans were eligible to exit the Empower/Prudential product at book value, and Defendants failed to take advantage of the Plans' opportunities.

141.   The following chart compares the performance of the CHLA SVOs to the performance of alternative general account products:

| Plan | Ins. Carrier | Product Trade Name | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | Average 2020-24 |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| Childrens Hospital Los Angeles Employees' 403(b) Plan | Empower / Prudential | Guaranteed Income Fund | 1.94% | 2.02% | 1.82% | 2.04% | 2.35% | 1.84% | 1.69% | 1.67% | 2.08% | 2.90% | 2.04% |
| Childrens Hospital Los Angeles Employees' 401(k) Plan | Empower / Prudential | Guaranteed Income Fund | 1.75% | 1.83% | 1.75% | 2.03% | 2.32% | 1.87% | 1.73% | 1.70% | 1.94% | 2.22% | 1.89% |
| Froedtert Health, Inc. 403(B) Plan | Lincoln | Stable Value Account | | | | | 2.50% | 2.57% | 2.51% | 2.58% | 2.53% | 2.80% | 2.60% |
| Brookhaven Science Associates, LLC 401(K) PLAN | TIAA | RC Plus / GSRA | | | | 3.18% | 3.15% | 3.12% | 2.93% | 3.31% | 3.92% | 3.92% | 3.44% |

stable value products available to the Plans during the statutory period. Both aim to preserve principal, carry an insurance company guarantee, and have similar contract provisions, including similar plan and participant level liquidity provisions. However, it should be noted that information on the underlying general portfolios is limited, as stable value products are not regulated by the SEC and are not required to disclose their underlying investments. Even so, TIAA is more highly rated than Empower/Prudential.

-40-

CLASS ACTION COMPLAINT

| Plan | Ins. Carrier | Product Trade Name | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | Average 2020-24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Presbyterian Healthcare Services 403(b) Plan | Met. Life | GIA | 2.93% | 2.94% | 2.95% | 2.93% | 2.97% | 2.95% | 2.96% | 3.00%* | 3.04% | 3.26% | 3.05% |
| Benco Dental Supply C. 401(k) Plan | MassMutual | Guaranteed Investment Contracts | 2.93% | 3.02% | 2.25% | 2.99% | 2.93% | 3.05% | 3.08% | 3.09% | 2.94% | 2.99% | 3.03% |
| Defined Contribution Retirement Plan of Moses Cone Health System | VALIC | VALIC Contract #65913 | 3.64% | 3.04% | 3.03% | 2.99% | 2.95% | 2.76% | 2.48% | 2.50% | 2.89% | 3.08% | 2.74% |
| Huntington Memorial Hospital Savings Plan | New York Life | Guaranteed Investment Contract | 2.34% | 2.51% | 2.40% | 2.40% | 2.51% | 2.50% | 2.35% | 2.36% | 2.86% | 3.16% | 2.64% |

\* Rate per Form 5500, Schedule H.

**Source: The information used to prepare this chart is taken from the Form 5500 filings by the plans with the U.S. Dep't of Labor.**

142. The chart above reflects stable value options offered within large, comparable defined contribution retirement plans. With the exception of crediting rates, the stable value products offered in those plans provide substantially the same benefits to participants as the Plans' stable value options.

143.   First, each of the plans referenced is a defined contribution plan, 403(b) or 401(k), similar in size to the Plans, with assets greater than $100 million at the end of 2024. Each has a stable value option from one of the leading providers of general account stable value products in the U.S. retirement plan market.

144.   Second, like the Plans' SVOs, each of the products is structured as a benefit-responsive insurance company general account guaranteed investment contract (GIC) with the same investment objective: to provide a guarantee of

-41-

CLASS ACTION COMPLAINT

principal, with modest returns equivalent to a short to intermediate term bond fund, but with substantially lower volatility.

145. Third, with the exception of crediting rates, the participants' experience with these stable value options is substantially the same. Like the Plans' SVOs, each of the alternative stable value options is benefit-responsive – that is, subject to permitted exceptions, the participant transacts at book value and can withdraw principal together with the interested credited, regardless of the financial performance of the funds held by the GIC provider. The benefit-responsive character of these products allows participants to use the stable value fund as the retirement plan equivalent of a checking account. The fact that the Plan' SVOs and each of the alternative products is benefit-responsive makes it appropriate to compare them to each other.

146. Fourth, with the exception of crediting rates, the risk and return characteristics of the products are similar or substantially the same. The insurance carriers have roughly equivalent credit ratings. Carriers such as TIAA and New York Life have higher credit ratings than Empower/Prudential.  Restrictions on liquidity at the plan level, which impact the plan's ability to exit and replace the product, also are similar. Differences in liquidity provisions are not material compared to the substantial difference in crediting rates.

147. Fifth, the crediting rates for each of these products is not tied to the performance of the assets in the insurer's general account and set in the discretion of the issuer of the product. The insurer retains the difference between the crediting rate and the returns on the funds deposited into its general account as spread.  As a result, there is substantial variability in the crediting rates offered to similarly situated plans and the spread retained by the provider. Plans that are more diligent in leveraging their size to test the market tend to receive higher crediting rates for the same level of risk, with the insurer retaining a lower spread. Plans that are less

-42-

CLASS ACTION COMPLAINT

diligent in leveraging their size to test the market tend to receive higher crediting rates for the same level of risk, with the insurer retaining a greater spread.

148.    By way of example, the Huntington Memorial Hospital Plan is a defined contribution 403(b) plan, with assets in the $500 million range, and a $12 million stable value option supplied by New York Life ("NYL"). The NYL product, like the Plans SVO, is a benefit-responsive insurance company general account stable value option. Crediting rates aside, the experience at the participant level is substantially the same. In terms of risk, the products are roughly equivalent, immaterial as compared to the crediting rate differential, with NYL being the more highly rated carrier. The rate differences, however, are substantial, with the NYL product having a higher crediting rate than the 401(k) and 403(b) CHLA SVOs in each of the years 2015-2019 leading up to the statutory period. Over the statutory period, the returns of the NYL product averaged 60 bps higher. For a conservative investment, this is a substantial difference.

149.    However, although the Plans' SVOs and the alternative products are similar in terms of their structure, participant experience, and risk and return characteristics, their financial performance is different. The financial performance of the SVO lags the performance of equivalent stable value products offered by TIAA, Lincoln, MassMutual, MetLife, and New York Life. It even lags the performance of products offered by the same provider, Empower, to other plans.

## PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' FIDUCIARY BREACHES

150.    Plaintiffs do not have actual knowledge of the specifics of Defendants' decision-making and monitoring processes with respect to the Plans because this information is solely within the possession of Defendants pending discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon, among other things, the investigation of counsel and the facts set forth above.

-43-

CLASS ACTION COMPLAINT

## CLASS ACTION ALLEGATIONS

151.    Plaintiffs bring this action in a representative capacity on behalf of the Plans and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and a Class defined as follows:

> All participants in or beneficiaries of the Children's Hospital Los Angeles Employees 401(k) Plan and the Children's Hospital Los Angeles Employees 403(b) Plan from six years prior to the filing of the complaint in this matter through the date of judgment (the "Class Period").

> American Growth Fund Subclass: All class members who invested in the American Funds Growth Fund of America A (AGTHX) during the Class Period.

> Stable Value Subclass: All class members who invested in the Prudential and/or Empower stable value option during the Class Period.

152.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

153.    Questions of law and fact common to the members of the Class predominate over questions that may affect individual class members, including, inter alia:

(a) whether Defendants are fiduciaries of the Plans;

(b) whether Defendants breached their fiduciary duty of prudence with respect to the Plans;

(c) whether Defendants had a duty to monitor other fiduciaries of the Plans;

(d) whether Defendants breached their duty to monitor other fiduciaries of the Plans; and

(e) the extent of damage sustained by Class members and the appropriate measure of damages.

-44-

154. Plaintiffs' claims are typical of those of the Class because his claims arise from the same event, practice and/or course of conduct as other members of the Class.

155. Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action litigation in general and ERISA class actions involving fiduciary breaches in particular.

156. Plaintiffs have no interests that conflict with those of the Class. Defendants do not have any unique defenses against Plaintiffs that would interfere with his representation of the Class.

157. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be too small for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are not aware of any difficulties likely to be encountered in the management of this matter as a class action.

**FIRST CAUSE OF ACTION**
**Breach of Fiduciary Duty of Prudence**
**(Against All Defendants)**

158. Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

159. Defendants were fiduciaries of the Plans under ERISA §§3(21) and/or 402(a)(1), 29 U.S.C. §§1002(21) and/or 1102(a)(1) and under common law trust law because they were either designated in the plan documents as the Plan Administrator, a named fiduciary under the Plans, performed discretionary Plan-related fiduciary functions, including the selection and monitoring of investment options for the Plans, and/or the negotiation over services and fees for the Plans, and/or were responsible for the administration and operation of the Plans.

-45-

CLASS ACTION COMPLAINT

160. As a fiduciary of the Plans, Defendants were required, pursuant to ERISA §404(a)(1), 29 U.S.C. §1104(a)(1) and common law, to act: "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan"; and "(B) to discharge their duties on an ongoing basis with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

161. Common law and ERISA's duty of prudence required Defendants to give appropriate consideration to those facts and circumstances that, given the scope of their fiduciary investment duties, they knew or should have known were relevant to the particular investments of the Plans and to act accordingly. See 29 C.F.R. §2550.404a-1. The Supreme Court has concluded that this duty is "a continuing duty to monitor [plan] investments and remove imprudent ones." Tibble, 135 S. Ct. at 1828.

162. As described above, Defendants failed to act prudently and in the best interest of the Plans and participants and breached its fiduciary duties in various ways. Defendants failed to make decisions regarding the Plans' investment lineup based solely on the merits of each investment and what was in the best interest of plan participants. Defendants selected and retained investment options in the Plans despite their high cost and poor performance relative to other comparable investments and failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plans. A prudent fiduciary in possession of this information would have removed these investment options, replaced them with more prudent and lower cost alternatives, and/or used the size, leverage and bargaining power of the Plans to secure significantly reduced fees for comparable investment strategies.

163. In addition, Defendants failed to monitor or control excessive compensation paid for recordkeeping services which resulted from the unnecessary

CLASS ACTION COMPLAINT

payment of recordkeeping and other services both directly and as a percentage of assets.

164. In addition, Defendants failed to monitor or control excessive compensation paid for shareholder or financial advising services which resulted from the unnecessary payment of those services as a percentage of assets.

165. Defendants knowingly participated in each fiduciary breach of the other plan fiduciaries, knowing that such acts were a breach, and enabled the other plan fiduciaries to commit fiduciary breaches by failing to lawfully discharge their own duties. Defendants knew of the fiduciary breaches of the other plan fiduciaries and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. §1105(a).

166. As a direct and proximate result of these breaches, the Plans, Plaintiffs and members of the Putative Class suffered substantial losses in the form of higher fees or lower returns on their investments than they would have otherwise experienced. Additionally and regardless of the losses incurred by Plaintiffs or any member of the Class, pursuant to ERISA §§502(a)(2) and (a)(3), and 409(a), 29 U.S.C. §§1132(a)(2) and (a)(3), and 1109(a), and common law trusts, Defendants and any non-fiduciary which knowingly participated in these breaches are liable to disgorge all profits made as a result of Defendants' breaches of the duties of loyalty and prudence, and such other appropriate equitable relief as the Court deems proper.

## SECOND CAUSE OF ACTION:
### Breach of Fiduciary Duty to Investigate and Monitor
### (Against All Defendants)

167. Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

-47-

CLASS ACTION COMPLAINT

168.    Defendants had overall oversight responsibility for the Plans and control over the Plans' investment options through its authority to limit or remove the other plan fiduciaries.

169.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and monitoring of plan assets, and must take prompt and effective action to protect the Plans and participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA and common law trusts.

170.    Defendants also had a duty to ensure that other plan fiduciaries possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plans' investments; and reported regularly to Defendants.

171.    Defendants breached their fiduciary monitoring duties by, among other things:

(a) failing to monitor and evaluate the performance of other fiduciaries to the Plans or have a system in place for doing so, standing idly by as the Plans suffered losses as a result of other fiduciaries' election to continue to pay fees that were significantly higher than what the Plans could have paid for a substantially identical investment products readily available elsewhere, as detailed herein;

(b) failing to monitor the processes by which the Plans' investments were evaluated, which would have alerted a prudent fiduciary to the excessive costs being incurred in the Plans to the substantial detriment of the Plans and the Plans' participants' retirement savings, including Plaintiffs and members of the Class; and

(c) failing to remove fiduciaries whose performance was inadequate, as they continued to maintain excessively costly investments in the Plans, all to the detriment of the Plans and participants' retirement savings; and,

-48-

CLASS ACTION COMPLAINT

(d) failing to institute competitive bidding for covered service providers and the stable value option.

172.    As a direct and proximate result of these breaches of the duty to monitor, the Plans, Plaintiffs, and members of the Class suffered millions of dollars of losses. Had Defendants complied with its fiduciary obligations, the Plans would not have suffered these losses, and participants would have had more money available to them for their retirement.

173.    Pursuant to ERISA §502(a)(2) and (a)(3), and ERISA §409(a), 29 U.S.C. §1132(a)(2) and (a)(3), and 29 U.S.C. §1109(a), Defendants are liable to disgorge all fees received from the Plan, directly or indirectly, and profits thereon, and restore all losses suffered by the Plans caused by its breach of the duty to monitor, and such other appropriate equitable relief as the Court deems proper.

### THIRD CAUSE OF ACTION
### Prohibited Transactions
### (Against All Defendants)

174.    Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

175.    As service providers to the Plans, Empower/Prudential and BSFG are parties in interest. 29 U.S.C. §1002(14)(B).

176.    By causing the Plans to use Empower/Prudential as recordkeeper and stable value provider and BSFG as investment advisor from year to year, Defendants caused the Plans to engage in transactions that Defendants knew or should have known constituted a direct or indirect furnishing of services between the Plans and Empower/Prudential and BSFG prohibited by 29 U.S.C. §1106(a)(1)(C). These transactions occurred each time the Plans paid fees to Empower/Prudential and BSFG for recordkeeping and advisory services and each time the Plans made deposits for the SVOs.

-49-

CLASS ACTION COMPLAINT

177.    Total losses to the Plans will be determined after complete discovery in this case and are continuing.

178.    Under 29 U.S.C. §1109(a), Defendants are liable to restore all losses to the Plans resulting from these prohibited transactions, and to provide restitution of all proceeds from these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

179.    Each Defendant knowingly participated in these transactions, enabled the other Defendants to cause the Plans to engage in these transactions, and knew of these transactions and failed to make any reasonable effort under the circumstances to remedy or discontinue the transaction. Thus, under 29 U.S.C. §1105(a), each Defendant is liable for restoring all proceeds and losses attributable to these transactions.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of the Plans and all similarly situated plan participants and beneficiaries, respectfully request the Court:

- Certify the Class, appoint Plaintiffs as class representatives, and appoint Christina Humphrey Law, P.C., James White Firm, LLC, and Bradley/Grombacher, LLP as Class Counsel;
- Find and declare that Defendants have breached their fiduciary duties as described above;
- Find and adjudge that Defendants are liable to make good to the Plans all losses to the Plans resulting from each breach of fiduciary duties, and to otherwise restore the Plans to the position it would have occupied but for the breaches of fiduciary duty;
- Determine the method by which plan losses under 29 U.S.C. §1109(a) should be calculated;
- Order Defendants to provide an accounting necessary to determine the amounts Defendants must make good the Plans under §1109(a);

CLASS ACTION COMPLAINT

- Find and adjudge that Defendants must disgorge all sums of money received from their use of assets of the Plans;

- Impose a constructive trust on any monies by which Defendants were unjustly enriched as a result of breaches of fiduciary duty or prohibited transactions, and cause Defendants to disgorge such monies and return them to the Plans;

- Surcharge against Defendants and in favor of the Plans all amounts involved in any transactions which an accounting reveals were improper, excessive, and/or in violation of ERISA;

- Order equitable restitution against Defendants;

- Award to Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant other equitable or remedial relief as the Court deems appropriate.

Dated: February 23, 2026

**CHRISTINA HUMPHREY LAW, P.C.**
**JAMES WHITE FIRM, LLC**
**BRADLEY/GROMBACHER, LLP**

By: _____
CHRISTINA A. HUMPHREY
JAMES H. WHITE IV
MARCUS J. BRADLEY
KILEY GROMBACHER

*Attorneys for Plaintiffs*

-51-

CLASS ACTION COMPLAINT